IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Vallerie Hardy, ) | Civil Action No. 6:10-2972-DCN-KFM |
| Plaintiff, ) | |
| ) | **REPORT OF MAGISTRATE JUDGE** |
| vs. ) | |
| ) | |
| Michael J. Astrue, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

This case is before the court for a report and recommendation pursuant to Local Civil Rule 73.02(B)(2)(a) DSC, concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff brought this action pursuant to Section 205(g) of the Social Security Act, as amended (42 U.S.C. 405(g)) to obtain judicial review of a final decision of the Commissioner of Social Security denying her claim for disability insurance benefits under Title II of the Social Security Act.

**ADMINISTRATIVE PROCEEDINGS**

The plaintiff filed an application for disability insurance benefits ("DIB") on October 26, 2001, alleging that she became unable to work on March 31, 1995. The application was denied initially and on reconsideration by the Social Security Administration. On January 23, 2003, the plaintiff requested a hearing. The administrative law judge ("ALJ"), before whom the plaintiff and Joel Leonard, a vocational expert, appeared on December 2, 2004, considered the case *de novo*, and on June 15, 2005, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. The

---

[1]A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

ALJ's finding became the final decision of the Commissioner of Social Security when it was approved by the Appeals Council on July 19, 2006. The plaintiff then sought judicial review, and, on June 15, 2007, the case was remanded by the district court for further administrative proceedings. Subsequently, the Appeals Council remanded the case to the ALJ, and, after a supplemental hearing held on February 7, 2008, the ALJ issued a second decision on March 28, 2008, finding that the plaintiff was not disabled during the period at issue – January 15, 1997, through June 30, 2000. On September 22, 2010, the Appeals Council declined to assume jurisdiction. The plaintiff then filed this action for judicial review.

In making his determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

1.  The claimant last met the insured status requirements of the Social Security Act on June 30, 2000.

2.  The claimant did not engage in substantial gainful activity during the relevant period from January 19, 1997, through her date last insured of June 30, 2000 (20 C.F.R. §§ 404.1520(b) and 404.1571 *et seq.*).

3. Through the date last insured, the claimant had the following severe impairments: residuals of degenerative disc disease of the cervical spine and surgery there, depression, and a pain disorder (20 C.F.R. § 404.1520(c)).

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual

2

functional capacity to perform light work as defined in 20 C.F.R. § 404.1567 (b), with no lifting and carrying in excess of 20 pounds occasionally and 10 pounds frequently and no standing and/or walking for more than 6 hours in a work day, but further, restricted to preclude more than occasional climbing of ladders or scaffolds.  By reason of her mental impairments, she is further restricted to simple, routine tasks in a supervised environment, with no required interaction with the public or team-type interaction with co-workers.

6. Through the date last insured, the claimant was unable to perform past relevant work (20 C.F.R. § 404.1565).

7.  The claimant was born on May 14, 1949, and was 47 years old, which is defined as a younger individual age 18-49, at the beginning of the period at issue (20 C.F.R. § 404.1563).  Her 50th birthday was May 14, 1999, and she was 51 years old on her date last insured.

8.  The claimant has a high school education and is able to communicate in English (20 C.F.R. § 404.1564).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

10.  Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that existed in significant numbers in the national economy that the claimant could have performed 20 C.F.R. §§  404.1560(c) and 404.1566).

11.  The claimant was not under a disability as defined in the Social Security Act, at any time from January 15, 1997,

3

through June 30, 2000, the date last insured  (20 C.F.R. § 404.1520(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. § 423(a).  "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions.  An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2)  has a severe impairment, (3)  has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4)  has an impairment that prevents past relevant work, and (5)  has an impairment that prevents him from doing substantial gainful employment.  20 C.F.R. § 404.1520.  If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.* § 404.1520(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62, 1982 WL 31386, at *3.  The plaintiff bears the burden of

4

establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. See *Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that his conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there

5

is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

### EVIDENCE PRESENTED

The medical evidence of record reflects the plaintiff's history of degenerative disc disease in her neck (with surgery in 1995), depression, diabetes, and obesity (5'5" tall, 217 pounds). During the relevant period, she sought treatment for chronic, severe neck, arm, head, and lower back pain; insomnia; and symptoms of anxiety and depression. An MRI showed minimal spinal arthritis (spondylosis) in the plaintiff's neck and no evidence of any herniated disc. Physical examinations were often unremarkable, showing, for instance, that she had normal upper extremity strength (Tr. 293, 298, 301, 310), acceptable range of motion, and normal reflexes (Tr. 293, 298).

In late 1998 and early 1999, the plaintiff underwent a two-part psychological evaluation by Clay Drummond, Ph.D., in connection with her treatment in an intensive pain management program (Tr. 173-73, *see also* Tr. 138-51). Based on the results of psychological tests (the MCMI-III and the MMPI-2), Dr. Drummond concluded that the plaintiff had mild to moderate psychological dysfunction, including dependent personality traits, obsessive compulsive personality features, schizoid personality features, generalized anxiety disorder, and an adjustment disorder with a depressed mood. He noted that the plaintiff's symptoms could be managed with various forms of therapy (Tr. 139, 144). Observing her somatic tendencies, Dr. Drummond diagnosed a "pain disorder associated with psychological factors and a general medical condition" and recommended pain management. He stated that the plaintiff's "physical problems are likely to be related to her depressed mood" (Tr. 149, 173) and noted that individuals with her MMPI-2 profile "are usually characterized by symptom exaggeration and a lack of effectively functioning defenses. They tend to show chronic psychological problems such as being tense and anxious, feeling more intense pain than other pain patients, and having reduced cognitive

6

functioning. . . . They tend to have the most employment difficulties and less treatment success than other pain patients" (Tr. 150).

Though the plaintiff sometimes complained that nothing helped alleviate her symptoms (*e.g.,* Tr. 293), on numerous other occasions she reported significant improvement in her pain, insomnia, and psychological symptoms with the use of various medications (*e.g.,* Tr. 179 (Neurontin helped her pain); Tr. 171 ("doing pretty well" in pain management program); Tr. 170 (Neurontin "helped the most," sleeping "a lot better" with Trazodone, denied significant depression symptoms); Tr. 175 (making gains regarding depression); Tr. 167 (Baclofen seemed to help); Tr. 166 ("doing better" on Prozac, "flare-ups are overall not as bad as they were," "recovering more quickly," "feels in good control"); Tr. 297 (sleeping better on Trazodone, feeling better on Prozac); Tr. 293 (pain clinic notes indicated she was "better," sleeping better with Trazodone, feeling better on Prozac); Tr. 284 (Baclofen helped control her pain, less lower back pain).

The plaintiff's primary care physician, Oscar F. Lovelace, M.D., opined in February 2000 that the plaintiff had "failed to improve" despite treatment at the pain management center and that she was "unable to be gainfully employed due to her illnesses and chronic pain" (Tr. 283).

In February 2002, state agency psychologist J.K. Phillips III, Ph.D., and physician Seham El Ibiary, M.D., reviewed the plaintiff's records and retrospectively assessed her condition through the expiration date of her insured status – June 30, 2000. Dr. Phillips found insufficient evidence to establish a mental impairment (Tr. 198-205, 206-19). Dr. El Ibiary found the plaintiff capable of the exertional demands of light work with no more than occasional climbing (Tr. 200). Later that year, state agency psychologist Lisa Varner, Ph.D., reviewed the plaintiff's records and found that, during the period at issue, the plaintiff had non-severe affective and somatoform disorders that caused no more than mild functional limitations (Tr. 184-96).

7

In November 2004—more than four years after the expiration of the plaintiff's insured status—Dr. Lovelace wrote a letter and completed a questionnaire in support of the plaintiff's claim for disability benefits.  He opined she had been disabled since February 2000, she would have to rest away from the work station for more than one hour during the working portion of the day, would miss more than three days of work per month, would need to elevate her  legs above waist level for more than one hour per day, and would likely have attention and concentration difficulties sufficient to interrupt tasks.  He stated that her back "always causes her significant pain" and that he had observed spasms, tenderness, and some loss of range of motion (Tr. 355-56).

That same month, Jeff Smith, M.D., wrote a letter stating that he began treating the plaintiff in May 2003—three years after the end of the relevant period—for major depression and anxiety and that he had reviewed the 1998-1999 MCMI-III and MMPI-2 test results (Tr. 354).  Dr. Smith found that those test results confirmed that the plaintiff's "anxiety, depression, and significant psychological reaction to pain caused essentially the same degree of limitation then as it does presently" (Tr. 354). He opined that she would have "great difficulty" with any activity requiring regular attendance, meeting a schedule, performing on a production schedule, or meeting quotas, and that she would miss more than three days of work per month and would need excessive work breaks.  He further opined that she would have "marked difficulty" dealing with work peers, supervisors, and the public (Tr. 354).

In January 2005, Dr. Drummond stated that, when he evaluated the plaintiff in 1998-1999, she had severe anxiety, somatoform, and depressive disorders that were "sufficiently severe to interfere with any regular activity, including work."  He opined that she would have missed more than three days of work per month and more than one hour during the working portion of the day.  He acknowledged that he "did not follow [her] before or after

8

this period, but it was clear that she had a chronic condition at the above level of severity both before and after treatment in our program" (Tr. 359).

In December 2007, Dr. Smith stated he had last treated the plaintiff in 2005, when her insurance was cancelled. He indicated that the plaintiff's condition, at that time, was about the same as it had been. He stated:

> Please see my questionnaire for an opinion as to her condition at the time I last saw her, and, indeed over the entire time I saw her. From time to time I made comments such as, "outlook is brighter," or "she is a bit more active." Comments like these should be taken in the context of her condition before that comment was made. In other words, she improved and regressed to some degree from visit to visit, but at best her condition never rose to the level at which she would be unable to function on an 8 hour day, 5 day per week basis. I have not seen her since, but in light of her long time, stable condition, it is unlikely that she improved significantly since I last saw her.

(Tr. 637).

Dr. Smith completed a Mental Residual Functional Capacity evaluation at this same time. He marked the following abilities as moderately limited: to understand and remember very short and simple instructions; to carry out very short and simple instructions; to sustain an ordinary routine without special supervision; to work in coordination with or proximity to others without being distracted by them; to make simple work-related decisions; to ask simple questions or request assistance; to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; to maintain socially appropriate behaviors and to adhere to basic standards of neatness and cleanliness; to be aware of normal hazards and take appropriate precautions; and, to travel to unfamiliar places or use public transportation. He marked the following abilities as "marked": to remember locations and work-like procedures; to understand and remember detailed instructions; to carry out detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance, and be punctual within

9

customary tolerances; to complete a normal work-day and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; to respond appropriately to changes in a work setting; and to set realistic goals or make plans independently of others. In the "remarks" section, Dr. Smith indicated that the plaintiff had "severe depression and anxiety, decreased concentration, decreased memory, decreased energy, decreased motivation, decreased interest." He stated the plaintiff was "fretful" and "easily overwhelmed by even small stressors." Dr. Smith's conclusion on functional capacity was "Patient cannot be punctual or reliable, cannot meet quotas or production standards, and cannot effectively deal with peers, supervisors, or public" (Tr. 638-640).

In December 2007, Dr. Lovelace provided a letter indicating that he continued to treat the plaintiff for her "intertwined" physical and mental problems. Despite a "fairly good outcome" from her diskectomy and fusion at C5-S1, he stated the plaintiff continued to have "residual impairment which is post laminectomy syndrome, with extremely long term, consistent complaints of neck and right arm pain, as well as back pain, and some degree of lost range of motion." Dr. Lovelace stated, "Most doctors have agreed that there is a myofacial component to this problem." Dr. Lovelace said:

> She has had continuing complaints of pain in her neck, shoulders, and arms, is forced to sleep on her stomach, use a back brace which we prescribed, and use a TENS unit.
>
> She is taking MS Contin 30 mg for her day to day pain, and Lortab, with a range of 0-40 mg of hydrocodone for breakthrough pain.
>
> Her diabetes makes it more difficult for her to recover from her musculoskeletal problems.
>
> Her depression makes it more difficult for her to deal with her pain, and her pain contributes to her depression. We have told her for many years that it is obvious that she is not going to be

> able to attend work on a predictable basis, and that certainly
> continues to be so. From either her musculoskeletal or
> depressive problems, for many, many years, going back well
> into the 90's, she would have missed hours out of any work
> day, and days out of any work month.

(Tr. 666-67).

At the first of two pre-remand administrative hearings on her current claim, the plaintiff testified that she had "excruciating" pain around the time she began pain management in 1998 (Tr. 396). At the second hearing, she testified that in 1998, her psychological condition had gotten "much better. . . . But it's just gotten awful, so awful" (Tr. 411).

At the second hearing, vocational expert Joel D. Leonard testified that the plaintiff's past work was sedentary to light in exertion and semi-skilled to skilled (Tr. 419-20). The ALJ asked Mr. Leonard to consider a hypothetical individual of the plaintiff's vocational profile, who could perform the exertional demands of light work, with no more than occasional climbing of ladders and scaffolds and the following mental restrictions: "simple routine work in a low stress, supervised environment, with no interaction with the public or team-type interaction with co-workers. . . . Also, there would be some limitation due to the alleged pain that would interfere with concentration" (Tr. 422-23, *see* Tr. 420-21). In response, Mr. Leonard identified the following unskilled, light jobs that such an individual could perform:

- a variety of "process machine tender" jobs, *e.g.,* DOT[2] 556.685-038, 190,000 jobs nationally and 1,700 jobs statewide;

- a variety of "sorter" and "packer" jobs, *e.g.,* DOT § 222.687-014, 124,000 jobs nationally and 1,500 jobs statewide; and

---

[2] U.S. Department of Labor *Dictionary of Occupational Titles* (4th ed. Rev. 1991) ("DOT").

11

- a variety of "small product assembler" jobs, *e.g.,* DOT § 739.687-030, 200,000 jobs nationally and 1,800 jobs statewide;

(Tr. 424).

At the post-remand hearing, the plaintiff testified that she continued to drive through June 2000; yet, she stated that, when she first started her pain management program around 1998, she was "mostly bedridden" and lying down was all she could do. She said she was actually worse when she finished the pain management program and that she spent five hours lying down during the day during the relevant period (Tr. 740, 742, 743, 746-47).

The same vocational expert, Mr. Leonard, testified at this hearing as well. In response to a hypothetical question with the same limitations as at the prior hearing (*see* Tr. 420-24), Mr. Leonard identified the same jobs and further explained his testimony, stating that, when he referred to "process machine tender," he was using "an umbrella term that's utilized to describe those constellation of jobs." He testified that there was no conflict between the correct DOT job descriptions and the restriction to unskilled work. He also gave specific unskilled light job examples within the machine tending classification, *e.g.,* injection mold machine tender (DOT 556.685-038) and assembly press operator (DOT 690.685-014) (Tr. 758, 760, 764).

## ANALYSIS

The relevant period at issue here is between January 15, 1997 (the day after the denial of the plaintiff's first application for disability benefits), through June 30, 2000 (the date the plaintiff was last insured for disability purposes). The plaintiff was 51 years old on the date last insured. She has a twelfth grade education and past work as an insurance underwriter, administrative specialist, and telephone operator. The ALJ determined that the plaintiff had the following severe impairments: residuals of degenerative disc disease of the cervical spine and surgery there, depression, and a pain disorder (Tr. 453). The ALJ further

12

found that the plaintiff could perform simple, routine, light work in a supervised environment, with limited climbing, no interaction with the general public, and no team-type interaction with co-workers (Tr. 455).    Relying on the testimony of a vocational expert, the ALJ determined that there were jobs that existed in significant numbers in the national economy that the plaintiff could have performed.  The plaintiff alleges that the ALJ erred by (1) failing to properly consider the opinions of her treating physicians; (2) failing to properly evaluate her subjective complaints; (3) failing to properly evaluate her residual functional capacity ("RFC"); and (4) relying on the vocational expert's testimony.

### Treating Physicians

The plaintiff first argues that the ALJ failed to properly consider the opinions of Drs. Smith, Drummond, and Lovelace.   This court disagrees. The regulations require that all medical opinions in a case be considered, 20 C.F.R. § 416.927(b), and, unless a treating source's opinion is given controlling weight, weighed according to the following non-exclusive list:   (1)  the length of the treatment relationship and the frequency of the examinations; (2) the nature and extent of the treatment relationship; (3) the evidence with which the physician supports his opinion; (4)  the consistency of the opinion; and (5) whether the physician is a specialist in the area in which he is rendering an opinion. 20 C.F.R. § 416.927(d)(2)-(5). *See also Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005). However, statements that a patient is "disabled," "unable to work," meets the listing requirements, or similar assertions are not medical opinions.  These are administrative findings reserved for the Commissioner's determination. SSR 96-5p, 1996 WL 374183, at *5.

The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case. *See* 20 C.F.R. § 416.927(d)(2); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001).  Social Security Ruling 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion. 1996 WL 374188, at *5.  As stated in Ruling 96-2p:

> [A] finding that a treating source medical opinion is not
> well-supported by medically acceptable clinical and laboratory
> diagnostic techniques or is inconsistent with the other
> substantial evidence in the case record means only that the
> opinion is not entitled to "controlling weight," not that the
> opinion should be rejected. Treating source medical opinions
> are still entitled to deference and must be weighed using all of
> the factors provided in [20 C.F.R. § 416.927]. In many cases,
> a treating source's medical opinion will be entitled to the
> greatest weight and should be adopted, even if it does not meet
> the test for controlling weight.

*Id.* at *4.

### Dr. Smith

Dr. Smith, the plaintiff's treating psychiatrist, stated in November 2004 that the plaintiff "would have great difficulty with any activity that called for regular attendance, meeting a schedule, performing on a production schedule, or [meeting] quotas," and "[s]he would have marked difficulty dealing with work peers, supervisors, and the public" (Tr. 354). He reiterated these opinions in a letter of explanation in December 2007, in addition to completing a Mental Residual Functional Capacity evaluation in which he indicated numerous moderate and marked functional limitations as outlined in the medical evidence section above (Tr. 637-40). Regarding these opinions, the ALJ stated:

> Dr. Jeff Smith is a psychiatrist who began treating the claimant
> during May 2003, obviously long after the period now at issue.
> On November 3, 2004, he prepared a report purporting to
> describe the claimant's mental condition back to 1995 (Exhibit
> B-13F). Since he cannot base his speculation on personal
> knowledge, he claims to have based it on his review of her
> records, including the MCMI and the MMPI (he does not identify
> what other "records" he reviewed). I have discussed above the
> weaknesses of those reports and their incomplete nature in
> evaluating any individual, including the claimant. I also think it
> is significant that Dr. Smith does not even state the claimant's
> history accurately. He suggests that her mental health
> treatment began with her referral to the pain center, without
> considering the earlier and continuing treatment by Dr.
> Lovelace.

(Tr. 463).

14

This court agrees with the Commissioner that the ALJ gave good reasons for discounting Dr. Smith's opinions. As the ALJ noted, Dr. Smith did not begin treating the plaintiff until May 2003, long after the period at issue (Tr. 462). He apparently based his opinion on a review of the plaintiff's MCMI-III and MMPI-2 test results (Tr. 354), which are not considered definitive and must be evaluated in conjunction with additional clinical information (Tr. 151). The ALJ referenced his earlier evaluation of these test results in his discussion of Dr. Smith's opinions (Tr. 463). The ALJ noted that the MCMI-III report concluded that the plaintiff demonstrated "psychological dysfunction of mild to moderate severity" (Tr. 460; *see* Tr. 139). The ALJ further noted that the MMPI-2 report stated that patients with the claimant's profile are "usually characterized by symptom exaggeration" (Tr. 460; *see* Tr. 150). Based upon the foregoing, this court finds that the ALJ appropriately evaluated and weighed Dr. Smith's opinion giving specific reasons for his findings.

### Dr. Drummond

In 2005, Dr. Drummond, the psychologist who administered the objective tests and was a member of the treatment team who worked with the plaintiff at the Center for Pain Management in 1998-1999, found that her psychological condition was severe enough to interfere with any regular work activity by causing lethargy, despondency, and a diminished capacity to interact with other people. He further concluded that she would have missed more than three days of work per month and more than one hour during the working portion of the day (Tr. 359).

The ALJ found as follows with regard to Dr. Drummond's opinion:

> Dr. Drummond, who arguably treated the claimant for the brief period of the pain management program, prepared a statement on January 31, 2005, purporting to assess her condition for at least the period he saw her (Exhibit B-16F). The limitations he suggests are that she would have missed more than three days a month of work and more than an hour of any work day due to her psychological problems. He bases much of that conclusion on his findings from the MCMI and the MMPI he administered. I have discussed above some of the inconsistencies between Dr. Drummond's conclusions and the written reports from the tests (Exhibits B-IF, B-2F). Another notable fact about those

tests is that the MCMI reported her profile to be willingly submissive to authority (Exhibit B-IF, page 4), while the MMPI described her profile as rejecting authority (Exhibit B-2F, page 3). As noted above, the MMPI report states that the claimant's profile is usually characterized by symptom exaggeration. The MMPI report states that the claimant's profile is "probably valid", but Dr. Drummond did not mention any doubt as to the validity of the results. In addition, it is essential to remember that both the MCMI and the MMPI reports state, essentially, that they cannot be considered definitive and must be evaluated in conjunction with additional clinical data (Exhibit B-IF, page 2; Exhibit B-2F, page 5).

It is in that clinical data that the weakness of Dr. Drummond's opinions becomes apparent. His role must be kept in mind: he saw the claimant for a psychological evaluation purely related to her participation in a pain management program. The record contains his initial report, his closing report, and a summary of his opinions prepared nearly six years later. None of those documents identify any treatment provided to the claimant by Dr. Drummond, though the medications prescribed by Dr. Lovelace are mentioned. Dr. Drummond asserts that it is "clear" that, both before and after the brief period he saw here, she had a chronic mental condition of disabling severity. The clinical notes and findings of Dr. Lovelace, her actual treating source before and after Dr. Drummond's episode, clearly contradict that conclusion. Her complaints began with marital conflict, improved greatly on a basic medication regimen, and remained largely stable throughout the period at issue.

(Tr. 462).

As noted by the ALJ, Dr. Drummond's reports in 1998-1999 and his opinion in 2005 differ as to the extent of the plaintiff's mental limitations. When he initially tested the plaintiff and performed the psychological evaluation, Dr. Drummond found "psychological dysfunction of mild to moderate severity" (Tr. 139). Six years later, without having seen the plaintiff in the interim, he opined that she would have missed more than three days of work per month and more than one hour during the working portion of the day (Tr. 359). The ALJ also noted inconsistent findings between the MCMI-III and MMPI-2 test results.  The ALJ noted that the record was devoid of any notes regarding treatment provided to the plaintiff by Dr. Drummond.  Moreover, as the ALJ observed, other medical records indicated the

plaintiff's psychological symptoms improved on a basic medication regimen (e.g., Tr. 175, 166, 293, 297).   Importantly, the ALJ also found that Dr. Drummond's opinion was inconsistent with the treatment notes of Dr. Lovelace, who treated the plaintiff both before and after Dr. Drummond saw her in the pain clinic.  Based upon the foregoing, this court finds that the ALJ appropriately evaluated and weighed Dr. Drummond's opinion giving specific reasons for his findings.

### Dr. Lovelace

Dr. Lovelace, a family practice physician, has been the plaintiff's primary care physician since May 1996. In February 2000 (Tr. 283), before her date last insured, and again in November 2004 (Tr. 355), he stated that the plaintiff was disabled since February 25, 2000. His second opinion outlined functional limitations such as missing more than three days of work per month, needing to rest away from the work station for more than one hour during the working portion of the day, needing to elevate her legs above waist level for more than one hour per day, and having attention and concentration problems sufficient to interrupt tasks (Tr. 355-56).

The ALJ assigned little weight to Dr. Lovelace's opinions, stating:

> As for the opinion evidence, I must first note the several opinions expressed by Dr. Lovelace, the claimant's primary care physician. In a letter written on February 25, 2000, at the request of the claimant, he wrote that she was unable to be gainfully employed due to her multiple illnesses and chronic pain, further commenting that she failed to improve after a pain management program (Exhibit 10F). During November 2004, Dr. Lovelace completed a questionnaire submitted by the claimant's attorney (Exhibit B-14F) and prepared a letter (Exhibit B-15F), both concluding that the claimant has been disabled since February 25, 2000 (interestingly, in his document, the claimant's attorney suggested an onset date of May 2001).
>
> A treating physician's medical opinion, on the issue of the nature and severity of an impairment, is entitled to special significance; and, when supported by objective medical evidence and consistent with other substantial evidence of record, entitled to controlling weight. Social Security Ruling 96-2p. On the other hand, statements that a claimant is

17

"disabled", "unable to work", can or cannot perform a past job, meets a Listing, or the like are not medical opinions but are administrative findings dispositive of a case, requiring familiarity with the Regulations and legal standards set forth therein. Such issues are reserved to the Commissioner, who cannot abdicate the statutory responsibility to determine the ultimate issue of disability. Opinions on issues reserved to the Commissioner, such as that of Dr. Lovelace, can never be entitled to controlling weight, but must be carefully considered to determine the extent to which they are supported by the record as a whole or contradicted by persuasive evidence. 20 CFR 404.1527(d)(2); SSR 96-5p.

In the reports of Dr. Lovelace, the only specific functional limitations cited for the claimant are a need to rest away from the work station, to elevate her feet, and concentration problems sufficient to interrupt tasks. Those specific limitations, as well as his general conclusion of disability, are not supported by his own clinical findings or those of any other physician, at least not for the period at issue here. I have discussed above the recurrent findings of his physical examinations, as well as those of Dr. Rambo, Dr. DuBose, and Dr. Prabhu. Dr. Lovelace's assertion that the claimant did not improve from the pain management program is not supported by the findings of the physicians there.

(Tr. 461-62).

The ALJ observed that Dr. Lovelace's opinion was "not supported by his own clinical findings or those of any other physician, at least for the period at issue here" (Tr. 462). The ALJ noted clinical examination findings from Dr. Lovelace and other physicians, then correctly noted that Dr. Lovelace's assertion that the plaintiff did not improve in the pain management program was not supported by the findings of the physicians there. Indeed, the record as a whole reflects evidence of only minimal spinal arthritis and no herniated disc in the plaintiff's neck (Tr. 310), and normal clinical findings with regard to the plaintiff's motor strength, range of motion, and reflexes during the period at issue (*e.g.*, Tr. 294, 298, 301). Further, as the ALJ noted, multiple treatment notes between 1997 and 2000 reflected improvement in the plaintiff's pain (as well as her insomnia and psychological symptoms) with various medications (Tr. 458-59; *see e.g.*, Tr. 166, 167, 170, 171, 175, 179, 284, 293, 297). Moreover, as the ALJ found (Tr. 462), Dr. Lovelace's treatment records do

18

not support his assertion that the plaintiff needed to elevate her legs above waist level one hour per day or that she had any documented attention and concentration problems. Based upon the foregoing, this court finds that the ALJ appropriately evaluated and weighed Dr. Lovelace's opinion giving specific reasons for his findings.

### Subjective Complaints

The plaintiff next argues that the ALJ erred in his evaluation of her complaints of pain. The Fourth Circuit Court of Appeals has stated as follows with regard to the analysis of a claimant's subjective complaints:

> [T]he determination of whether a person is disabled by pain or other symptoms is a two-step process. First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged. . . . It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated.

*Craig v. Chater*, 76 F.3d 585, 594-95 (4th Cir. 1996). A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical evidence and other evidence. 20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4). Furthermore, "a formalistic factor-by-factor recitation of the evidence" is unnecessary as long as the ALJ "sets forth the specific evidence [he] relies on in evaluating the claimant's credibility." *White v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001). Social Security Ruling 96-7p states that the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record." 1996 WL 374186, at *4. Moreover, it "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight." *Id.*

The factors to be considered by an ALJ when assessing the credibility of an individual's statements include the following:

19

(1)  the individual's daily activities;

(2)  the location, duration, frequency, and intensity of the individual's pain or other symptoms;

(3)  factors that precipitate and aggravate the symptoms;

(4)  the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

(5)  treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

(6)  any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

(7)  any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Id.* at *3.

The ALJ found that while the plaintiff's medically determinable impairments could reasonably be expected to cause some alleged symptoms, her statements concerning the intensity, persistence and limiting effects of the symptoms were not credible to the extent they were inconsistent with the RFC assessment (Tr. 456). The ALJ found as follows:

The clinical picture reflected in these records shows rather limited objective findings to support the degree of limitations asserted by the claimant for the period at issue.  The post-operative treatment notes from her neurosurgeon and Dr. Lovelace show a rather prompt return to physical activities after her surgery.  Then she went for over a year without returning to Dr. Lovelace.  Dr. Lovelace repeatedly made clinical findings inconsistent with the degree of limitations the claimant has asserted.  Dr. Samuels found no reason to see the claimant for further follow-ups.  Dr. Lovelace then referred the claimant to another neurosurgeon, and Dr. Rambo's examination also was inconsistent with disabling impairment.  As discussed above,

20

the notes of personnel treating her during the pain management program in 1998-99 document improvement in her pain and her mental symptoms. Following that program, even Dr. Lovelace commented on the inconsistencies between the claimant's statements and the reports of Dr. DuBose and Dr. Prabhu. With regard to her mental condition, the claimant initially reported essentially a situational depression and thereafter had good response to a simple medication regime prescribed by Dr. Lovelace. She did not pursue additional psychotherapy, as suggested by Dr, Drummond, until long after the period at issue. The objective clinical findings from her treating and examining sources support the residual functional capacity described above.

In evaluating the claimant's credibility, I must again note the limited findings to support the degree of functional restrictions she asserted for the period at issue. The notes of her doctors certainly contain no mention of her claim to be bedridden, with much of each day spent in bed or a recliner. As noted, she went for long parts of the period at issue without seeing any physician. The records show several instances of her failure to pursue treatment measures advised by her doctors (physical therapy ordered in Dr. Lovelace's clinic; psychotherapy suggested by Dr. Drummond; running out of prescribed medications that were effective for her without seeking refills). It is also significant to note that, during August 1996, Dr. Lovelace wrote that the claimant told him she was not exercising because she had "gotten lazy" (Exhibit 5F, page 25). In contrast to her assertions that her condition has been essentially unchanged since her surgery, the findings of multiple physicians clearly show periods of improvement, with much greater activity by the claimant, sometimes with long periods without medical care, before recurrence of some degree of symptoms. I also find it significant to review the claimant's comments to the personnel treating her during the pain program. While she told Dr. Drummond that her depression was improved, she also told him that her pain level

21

had increased as a result of the program (Exhibit 7F, page 1).
At the same time, the reports of Dr. DuBose show improvement
in her pain (Exhibit 9F, pages 1-2; Exhibit B-3F, page 2). The
treatment notes of Dr. Lovelace never suggest mental
complaints of the severity she alleged in her testimony, nor
treatment for any such severe symptoms. After careful review
of all the evidence, I do not find the testimony of the claimant as
to pain and other subjective symptoms to be credible to
establish impairment of the disabling severity alleged.

(Tr. 460-61).

This court agrees with the Commissioner that the ALJ appropriately
considered the plaintiff's complaints of pain. The ALJ cited not only the lack of objective
findings supporting the degree of functional restrictions alleged by the plaintiff, but also
discussed at length other reasons for finding her testimony was not credible to establish
impairment of disabling severity. Specifically, the ALJ discussed at length the evidence of
the plaintiff's improvement with medications, physical therapy, and treatment in the pain
management program (Tr. 457-61). The ALJ also discussed the fact that none of her
treating physicians mention that the plaintiff was bedridden, as she claimed. Also, the
plaintiff went for long parts of the period at issue without seeing any physician. The ALJ
further noted that the plaintiff had at times failed to follow treatment measures advised by
her doctors, including psychotherapy, exercise, physical therapy, and keeping her
medication filled (Tr. 461). Here, the ALJ set forth the specific evidence he relied upon in
making his credibility finding in accordance with the above-cited law. This allegation of error
is without merit.

### *Residual Functional Capacity*

The plaintiff next argues that the ALJ failed to explain his assessment of her
physical and mental RFC and failed to take into account her non-severe impairments. This
court disagrees. The ALJ found as follows:

22

> After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b), with no lifting and carrying in excess of twenty pounds occasionally and ten pounds frequently and no standing and/or walkng for more than six hours in a work day, but further restricted to preclude more than occasional climbing of ladders or scaffolds. By reason of her mental impairments, she is further restricted to simple, routine tasks in a supervised environment, with no required interaction with the public or team-type interaction with co-workers.

(Tr. 455).

As argued by the Commissioner, the ALJ devoted a considerable portion of his decision to providing a narrative in support of his assessment of the plaintiff's RFC (Tr. 455-63). He specifically stated that he considered the entire record, including all of the plaintiff's symptoms (Tr. 455). The ALJ specifically addressed the plaintiff's testimony, examinations before and during the relevant period, normal or near-normal objective medical findings, evidence of improvement with certain treatment modalities, her psychological problems and treatment, inconsistencies between the plaintiff's claims and the medical records, and the opinions of Drs. Lovelace, Drummond, Smith, and the state agency consultants (Tr. 456-63). Further, though the plaintiff argues the ALJ failed to consider the impact of her non-severe impairments (obesity, migraines, anxiety, and asthma) on her ability to work, not a single medical source ever concluded that those impairments caused functional limitations beyond those assessed by the ALJ, and as mentioned above, the ALJ specifically stated that he considered the entire record in assessing her limitations (Tr. 455). Notably, at the second step of the sequential evaluation process, the ALJ found that there was no evidence that the plaintiff's obesity limited her ability to function or to perform routine activities within a work environment beyond the limitations included in her RFC (Tr. 453). He further noted that during the period at issue the plaintiff did not have significant treatment for asthma, migraines, or anxiety (Tr. 453). Furthermore, the plaintiff has not stated what additional functional limitations should have

been included by the ALJ to account for the cumulative effects of her non-severe impairments.

This court finds that the ALJ provided a reasoned assessment of the RFC finding, and this allegation of error is without merit.

***Vocational Expert***

Lastly, the plaintiff argues that the ALJ erred in relying on the vocational expert's testimony. The ALJ found as follows at the fifth step of the sequential evaluation process:

> Through the date last insured, if the claimant had the residual functional capacity to perform the full range of light work, a finding of "not disabled" would be directed by the Medical-Vocational Rules 202.21 (prior to the age of 50) and 202.14 (beginning at age 50). However, the claimant's ability to perform all or substantially all of the requirements of this level of work was impeded by additional limitations. To determine the extent to which these limitations erode the unskilled light occupational base, through the date last insured, I asked the vocational expert whether jobs existed in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity. The vocational expert testified that given all of these factors the individual would have been able to perform the requirements of representative occupations such as process machine tenders, with 1,700 such jobs in South Carolina and 190,000 in the United States; sorters and packer, 1,500 such jobs in South Carolina and 200,000 in the national economy.
>
> In light of the Report and Recommendations of the Magistrate Judge in the District Court, I must comment specifically on any conflicts between the vocational expert's testimony and the Dictionary of Occupational Titles (DOT). As an initial matter, I would note that the same vocational expert testified at the supplemental hearing as at the original hearing and that he

identified the same jobs in both hearings as those that could be performed by the hypothetical individual.

In his brief to the Court (Exhibit B-18E, particularly at pages 37-39), the claimant's attorney argued that none of the jobs identified by the vocational expert during the initial hearing constituted simple unskilled work, as required by the hypothetical question given to him. In doing so, he misstated much of the testimony of the vocational expert and ignored other parts of that testimony. Unfortunately, that incorrect information was then included in the  Report and Recommendation of the Magistrate Judge without correction. During the current hearing, the vocational expert closely reviewed the transcript of his previous testimony and the Report of the Magistrate Judge in answering my questions. The claimant's attorney argued first that there is no "process machine tender" job listed in the DOT. The vocational expert testified that each of the job titles he identified was a broad job category, that included a constellation of specific jobs involving similar duties and job characteristics. The DOT numbers he gave for the jobs were for representative specific jobs among the broad constellation included in the title he used.

The error of the claimant's attorney is particularly significant with regard to the "sorters and packers" jobs listed by the vocational expert. The claimant's attorney asserted that the specific job of "sorter/packer" is list[ed] in the DOT, with a number of 976.687-018 and a specific vocational preparation (SVP) level of 3, which is described in the DOT as the lowest level of semi-skilled work. Once again, the vocational expert testified that his job term of "sorters and packers" involves a constellation of jobs within the limitations of the hypothetical question. He confirmed that he never used the specific DOT number cited by the claimant's attorney and acknowledged that work with an SVP level of 3 would constitute semi-skilled work. That was not the job he identified.

The other issue raised by the claimant's attorney involves the "reasoning" level required for the jobs identified within the job characteristic of "general educational development" (GED). He argued that the job titles he cited (as discussed above, those jobs may or may not have been the same as the jobs identified by the vocational expert) all involved a GED reasoning level of 2, which include "detailed but uninvolved written or oral instructions", then suggesting that such a description is inconsistent with simple, unskilled work. The vocational expert testified that the argument of the claimant's attorney is wrong: in a vocational sense, job instructions can clearly be detailed yet also simple and unskilled. Within the structure of the Social Security Act and the Regulations, the SVP level of jobs (not the GED characteristics of work) is the applicable basis for evaluating work capacity.

The claimant's attorney then asked the vocational expert to consider a hypothetical individual with the same limitations described in my hypothetical question, with additional limitations as described by Dr. Drummond in Exhibit B-16F; specifically, that included missing more than three days of work per month and more than one hour during the work day due to her mental impairments. The vocational expert responded that he could identify no jobs that such an individual could perform. The claimant's attorney then asked him to consider the same hypothetical individual but with additional limitation, as suggested by Dr. Lovelace, that she must elevate her legs during the work day (Exhibit B-14F). The vocational expert stated that he could identify no jobs that such an individual could perform. For the reasons described above, I do not find the limitations suggested by the claimant's attorney to be supported by the evidence of record or credible in evaluating the claimant's disability.

Pursuant to SSR 00-4p, there are no conflicts between the vocational expert's testimony and the information contained in the Dictionary of Occupational Titles.

26

> Based on the testimony of the vocational expert, I find that, considering the claimant's age, education, work experience, and residual functional capacity, the claimant was capable of making a successful adjustment to other work that existed in significant numbers in the national economy.  A finding of "not disabled" is therefore appropriate under the framework of the above-cited rules.

(Tr. 464-66) (emphasis in original).

This court finds that the vocational expert's testimony was substantial evidence that the plaintiff could perform work that existed in significant numbers in the national economy.  The vocational expert previously testified (then subsequently reiterated at the most recent hearing) that an individual with the plaintiff's limitations could work as a "process machine tender" (*e.g.*, DOT 556.685-038, injection molding machine tender) with 190,000 jobs nationally and 1,700 jobs statewide; a "sorter"/"packer" (*e.g.*, DOT 222.687-014, garment sorter) with 124,000 jobs nationally and 1,500 jobs statewide; and a "small product assembler" (*e.g.*, DOT 739.687-030, assembler, small products II) with 200,000 jobs nationally and 1,800 jobs statewide) (Tr. 424-25; *see also* Tr. 755-64 (identifying same occupations at post-remand hearing)). At the most recent hearing, the expert testified that when he referred, for instance, to "process machine tender," he was using "an umbrella term that's utilized to describe those constellation of jobs" (Tr. 758). He also provided an additional example of a process machine tender: DOT 690.685-014, assembly-press operator (Tr. 760, 764).

The plaintiff argues that conflicts exist between the vocational expert's testimony and the DOT because "none of these jobs [cited by the expert] satisfy the ALJ's limitation to simple, unskilled work" and that the expert's offering of a "broad occupational category that included a constellation of specific jobs involving similar duties and job characteristics" did not satisfy the "requirement of providing specific jobs which exist in the national economy that [the plaintiff] could perform" (pl. brief at 28-30).

This court agrees with the Commissioner that the plaintiff's arguments fail for several reasons.  First, the plaintiff's argument relies heavily on the prior court decision remanding the case in which the judge found that certain DOT descriptions did not align to the vocational expert's testimony that the jobs were unskilled (pl. brief at 29). However, as the vocational expert subsequently explained at the post-remand hearing, the judge in the prior court action was relying on at least one DOT example cited by the plaintiff in her  brief in that case that the expert had not cited in his testimony: DOT 976.685-014 (Tr. 758; *see* Tr. 570).  Further, a review of the testimony at both the pre- and post-remand hearings and the DOT confirms that the examples offered by the vocational expert were all, in fact, unskilled, having specific vocational preparation ("SVP") levels of 2. *See* DOT 556.685-038, DOT 222.687-014, DOT 739.687-030, DOT 690.685-014. Social Security Ruling 00-4p provides that unskilled work, as defined in the Commissioner's regulations, correlates to an SVP of 1 or 2 in the DOT description.  2000 WL 1898704, at *3; *see* 20 C.F.R. § 404.1568. Furthermore, while the plaintiff argues that it was improper for the vocational expert to cite broad occupations rather than "specific jobs," the expert proceeded to give several specific examples of each (Tr. 762-64 (identifying DOT 556.685-038 and DOT 690.685-014 as examples of a process machine tender; DOT 222.687-014 as an example of a sorter/packer; and DOT 739.687-030 as an example of a small products assembler)).

Based upon the foregoing, the ALJ reasonably relied on the vocational expert's testimony to find that the plaintiff could perform work existing in significant numbers in the national economy.  Accordingly, this allegation of error is without merit.

### CONCLUSION AND RECOMMENDATION

This court finds that the Commissioner's decision is based upon substantial evidence and free of legal error.  Now, therefore, based upon the foregoing,

IT IS RECOMMENDED that the Commissioner's decision be affirmed.

January 6, 2012                                                    s/ Kevin F. McDonald
Greenville, South Carolina                                 United States Magistrate Judge